**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 1998-DP-01134-SCT**

*MACK ARTHUR KING*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/10/1998 |
| TRIAL JUDGE: | HON. HARVEY S. BUCK |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL R. FARROW |
| | JAMES E. ROCAP, III |
| | ANTHONY J. BELLIA, JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | LESLIE S. LEE |
| | JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT |
| DISPOSITION: | REVERSED AND REMANDED - 04/19/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/10/2001 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. This case arises from Mack Arthur King's re-sentencing to death for the August 3, 1980, capital murder of Lela Patterson. For the reasons addressed below, we reverse the death sentence and remand for a new sentencing trial.

**I.**

¶2. Mack Arthur King was found guilty of capital murder and sentenced to death on December 5, 1980. On October 27, 1982, we affirmed both the conviction and the sentence. A timely petition for rehearing was filed and later denied by this Court on December 1, 1982. *See King v. State*, 421 So. 2d 1009 (Miss. 1982). The United States Supreme Court denied King's petition for writ of certiorari on May 2, 1983. *See King v. Mississippi*, 461 U.S. 919, 103 S. Ct. 1903, 77 L. Ed. 2d 290 (1983). We denied his subsequent application for leave to file a petition for writ of error coram nobis in the Circuit Court of Lowndes County but later ordered that court to conduct a hearing regarding King's claim of ineffective assistance of counsel. *See King v. Thigpen*, 446 So. 2d 600 (Miss. 1984); *King v. Thigpen*, 441 So. 2d 1365 (Miss. 1983). The circuit court conducted a hearing on the matter and found that counsel had rendered effective assistance. We affirmed the trial court's denial of relief on February 18, 1987. *See King*

*v. State*, 503 So. 2d 271 (Miss. 1987).

¶3. King then filed a petition for writ of habeas corpus with the United States District Court for the Northern District of Mississippi. The district court denied relief. *See King v. Pressley*, No. EC87-126-S-D. On August 25, 1993, the Fifth Circuit vacated the sentence of death and remanded the case with instructions to return to the state court for reconsideration of the sentence of death in light of *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L. Ed. 2d 725 (1990). *See King v. Puckett*, 1 F.3d 280 (5th Cir. 1993). We vacated the sentence of death and remanded for a new sentencing trial. *See King v. State*, 656 So. 2d 1168 (Miss. 1995).

¶4. King was re-sentenced to death on April 9, 1998. His motion for new trial was denied on July 1, 1998. King now appeals that judgment.

## II.

¶5. "On appeal to this Court, convictions of capital murder and sentences of death must be subjected to what has been labeled 'heightened scrutiny.' Under this method of review, all bona fide doubts are to be resolved in favor of the accused because what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992). With that standard in mind, we consider the issues raised. We address only those issues which require reversal or which deserve mention lest a problem recur on retrial.

## III.

### WHETHER THE LOWER COURT ERRED BY EXCLUDING ELIGIBLE JURORS WHO MAY OPPOSE THE DEATH PENALTY.

¶6. King asserts that the trial court erroneously excused several jurors from the jury venire who generally opposed the death penalty but vowed to follow the court's instructions and vote for death if warranted. Specifically, King argues that the trial court erroneously excused Louise Gray, Linda Fulton, and Tommy Clayborn.

¶7. In completing the attorney questionnaire, Gray answered "no" to the question, "Could you ever personally vote to impose the death penalty?". When asked during general voir dire whether she could personally "impose the death penalty," Gray again responded "no." The prosecutor asked whether she could impose the death penalty "even if the evidence warranted." She responded that she would have to hear some evidence first. The prosecutor asked, "Are you still saying you could not impose the death penalty?" Gray answered, "That's what I'm saying 'cause I don't know anything about it." King argues that Gray then clearly stated that she would follow the court's instructions and could vote for a death sentence if warranted in this case.

¶8. The State moved to excuse Gray for cause. Defense counsel objected by arguing that general opposition to the death penalty is not enough to strike a person for cause. The trial court ruled stating, "She said on her-uh-thing she's opposed to the death penalty. She said out there she was opposed to the death penalty. I'm not going to let someone like that sit on the jury."

¶9. Fulton also contradicted her initial negative response to the question about her ability to vote for the death penalty. Regarding this response, the prosecutor asked Fulton during voir dire, "Is that still your

feeling today?" She answered, "I can't say right now. I don't know." She later stated that, depending on the facts of the case, she "probably could" personally impose the death penalty. Fulton stated that she did not know what changed her mind. When asked if she could follow the instructions given by the court, she responded "Yeah, I can follow the instructions, sure." The trial judge stated that he was "trying to get a jury to be here and be fair and impartial to both sides" before he struck Fulton for cause.

¶10. Clayborn stated on his questionnaire that he agreed with the death penalty. He marked "no," however, to the question, "Could you ever personally vote to impose the death penalty?" During questioning by the prosecution during voir dire, Clayborn again stated that he could not impose the death penalty but recanted when questioned by defense counsel. When questioned once more by the prosecution, Clayborn returned to his original position and stated that he could not impose the death penalty. The trial judge excused him for cause.

¶11. The test for determining when a prospective juror's views on the death penalty justify his removal is whether the trial court finds that the "juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath" thus leaving the trial court "with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt*, 469 U.S. 412, 424-26, 105 S.Ct. 844, 852-53, 83 L. Ed. 2d 841, 851-52 (1985). If the judge is concerned with the response given, he must further determine whether the potential juror could follow the law as instructed even if the juror expressed a general disapproval of the death penalty. "This is why deference must be paid to the trial judge who sees and hears the juror." *Id.*

¶12. We have long held that it is the trial judge's domain to judge matters regarding credibility of a witness including prospective jurors. *Harris v. State*, 527 So. 2d 647, 649 (Miss. 1988). The circuit judge, as he must, has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. *Mississippi Winn-Dixie Supermarkets v. Hughes*, 247 Miss. 575, 156 So. 2d 734, 738 (1963). However, it is reversible error if one juror is erroneously excused from the jury on the basis of his view on the death penalty. *Gray v. Mississippi*, 481 U.S. 648, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987) .

¶13. In the case sub judice, the trial judge excluded each of the three potential jurors because of his or her contradictory responses to the questions regarding the death penalty. In *Dufour v. State*, 453 So. 2d 337, 341-44 (Miss. 1984), certain potential jurors were excluded who gave contradictory responses, wavered on their position, and generally appeared confused regarding the death penalty issue. We found no reversible error in the trial court's excluding the potential jurors for cause. *Id.* at 345.

¶14. The record establishes that the court excluded Gray because she repeatedly switched positions as to whether she supported or opposed the death penalty. The judge obviously had ample opportunity to observe this juror, and her apparent confusion was sufficient reason for dismissal. In striking Fulton, the judge articulated that he was "trying to get a jury to be here and be fair and impartial to both sides." A logical reading of the transcript indicates that because Fulton had given different answers at different points, the trial judge found she would not be fair and impartial and, therefore, would not be able to follow the law. It goes without saying that a potential juror who cannot give a straight answer would be very unlikely to follow the law. Finally, we find no abuse of discretion in the court's excusing Clayborn for cause. Clayborn continually wavered on his stance regarding the death penalty and exhibited an obvious confusion concerning the issue. Given this potential juror's equivocal stance on the issue, we find that the trial court did

not abuse its discretion in striking him for cause.

## IV.

### WHETHER THE TRIAL COURT ERRED IN DENYING KING FUNDS TO RETAIN AN EXPERT PATHOLOGIST.

¶15. King argues that he was deprived of due process of law in violation of the United States and Mississippi Constitutions when the trial court denied him the expert assistance of a pathologist. The State used pathologist testimony to support its argument that this crime was "especially heinous, atrocious or cruel."

¶16. The State called an expert, Dr. Ben Martin, who testified that Patterson was conscious when she was killed. Dr. Martin testified to specific procedures used to show how he came to his conclusion that Patterson was conscious. Dr. Martin further testified that Patterson's head injuries were the result of multiple blows to the head. King was denied his own expert to rebut this testimony.

¶17. A defendant is entitled to an expert to rebut expert opinion on "crucial elements." *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S. Ct. 1087, 1093, 84 L. Ed. 53 (1985). A fundamental question to be answered, however, is whether King has shown a "substantial need" for expert assistance. "Mississippi case law states expert assistance should be granted upon a showing of substantial need." *Holland v. State*, 705 So. 2d 307, 333 (Miss. 1992) (quoting *Butler v. State*, 608 So. 2d 314, 321 (Miss.1992)). "'Undeveloped assertions' of helpfulness to the defense are insufficient to show that need." *Id.* (quoting *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991)).

¶18. The crucial issue here was whether the crime was heinous, atrocious, or cruel. Thus, whether Patterson was conscious during the strangulation and drowning becomes a significant question. Certainly, this is a "crucial issue" within the meaning we have given that term. However, King can show no substantial need for his own expert witness since, upon cross-examination, Dr. Martin testified that Patterson *may have been unconscious* during the strangulation and drowning. Dr. Martin's testimony directly rebutted the State's argument and aided King in his defense. Consequently, King suffered no prejudice by not having a pathologist testify on his behalf. The error, if present, was harmless.

## V.

### WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT SYMPATHY COULD HAVE "NO PART" IN THE CASE.

¶19. King contends that the trial court erred in instructing the jury that sympathy could have no part in the case. King notes that even before the parties presented their cases, the trial court instructed the jury venire:

> Jurors must be as free as humanly possible from bias, prejudice or sympathy. None of these have any part in any of your deliberations. You must be free-must not be biased, you must not be prejudiced, you're not-must not consider sympathy as part of the case.

Further, King notes that in closing argument, defense counsel asked the jury for "understanding," "compassion," and "mercy." The trial court cut off this line of argument in a bench conference and said, "You can't ask for sympathy in any way." After closing argument, King notes that immediately before the

jury deliberated, the trial court instructed the jury:

> I thought I heard one of them say go back there and have sympathy. You remember when we started I instructed you that what the attorneys said was not evidence. The evidence you have to base your decision on has come from this stand and the exhibits offered and received into evidence and I told you that-uh-bias or prejudice or sympathy have no part in your deliberations. You recall that?

> (Panel responds affirmatively.)

¶20. We have repeatedly held that under the Eighth Amendment to the U.S. Constitution, "a jury may not be instructed to disregard, in toto, sympathy" in a capital case. *Pinkney v. State*, 538 So. 2d 329, 351 (Miss. 1988), *vacated and remanded on other grounds,* 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed. 2d 931 (1990). King insists that no two instructions could have more clearly instructed the jury to disregard sympathy in toto than "[y]ou . . . must not consider sympathy as part of this case" and "sympathy [can] have no part in your deliberations."

¶21. In *Blue v. State*, 674 So. 2d 1184, 1225 (Miss. 1996), we approved an instruction which read in pertinent part as follows:

> [Y]ou are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

"[B]ecause the instruction does not inform the jury that it must disregard in toto sympathy . . . the instruction is a proper statement of the law." *Id.* While we have approved this type of general instruction admonishing the jury not to be swayed by "sympathy" unrelated to the evidence, we have guarded against any undue emphasis of the anti-sympathy admonition so as not to fetter unduly reasoned consideration of factors offered as mitigating. *See Willie v. State*, 585 So. 2d 660, 677 (Miss. 1991). We do this in full recognition of the fact that the line between a rational and an emotional response is often dim.

¶22. Miss. Code Ann. § 99-19-101(1) provides in pertinent part: "The state and the defendant and/or his counsel shall be permitted to present arguments for or against the sentence of death." Clearly, it is appropriate for the defense to ask for mercy or sympathy in the sentencing phase. It is equally appropriate for the state to further its goal of deterrence by arguing to "send a message" in the sentencing phase. Both of these arguments are recognized as legitimate considerations to be had by those who argue "for or against" the death penalty. In *Humphrey v. State*, 759 So. 2d 368, 374 (Miss. 2000), we allowed the prosecution to present a "send a message" argument to the jury during the sentencing phase of a bifurcated capital trial. We based our decision on *Wells v. State*, 698 So. 2d 497, 513 (Miss. 1997), where we chose "not to fault the prosecution for arguing that the 'message' conveyed by a death penalty verdict would be different than that urged by the defense." We stated, "To do so would be disingenuous given the inescapable reality that deterrence is, in fact, an established goal of imposing the death penalty, which goal necessarily entails, to some extent, sending a message."

¶23. We today follow the above-cited statute and hold that in closing argument during the sentencing phase each side may argue its respective position on the death penalty. Of course, neither side may ever argue these positions during the guilt phase; for a conviction or an acquittal must be based solely on law and fact. It should be noted further that neither side is entitled to a jury instruction regarding mercy or deterrence. To the extent that our holding is contrary to previous case law on the subject, those cases are expressly

overruled.

¶24. A jury's willingness to sympathize or to send a message is developed through the broad range of human experience that jurors bring to the proceedings. The belief that jurors could erase the natural human considerations that underlie their decisions would be naive. To insist that they do so would be futile and, according to the law of this state, erroneous.

¶25. The line we have carefully established has been breached. The error is all the more harmful as it occurred at the close of oral argument just before the jury retired to deliberate and after the State had ample opportunity in closing to respond to the defendant's arguments. The court's decision to single out one aspect of its prior instructions took on an adversary tone which may have placed the judge on the side of the prosecution in the eyes of the jury. This is improper. "We have made clear that we will not hesitate to reverse where the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution." *Layne v. State*, 542 So. 2d 237, 242 (Miss. 1989). We have also recognized that "[i]t is a matter of common knowledge that jurors . . . are very susceptible to the influence of the judge . . . jurors watch his conduct and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict." *Thompson v. State*, 468 So. 2d 852, 854 (Miss. 1985). For the foregoing reasons, we find that the trial court's statements constitute reversible error.

## VI.

## WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE AGGRAVATING "HEINOUS, ATROCIOUS OR CRUEL."

¶26. King contends that the trial court erred once again in instructing the jury on the aggravator "especially heinous, atrocious or cruel." King contends that the trial court's instruction on the "heinous, atrocious or cruel" ("HAC") aggravator was unconstitutionally vague. He notes that the U.S. Supreme Court explained that "channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S. Ct. 1853, 1858, 100 L. Ed.2d 372 (1988). King insists that the HAC aggravator is unconstitutional because it fails "adequately to inform juries what they must find to impose the death penalty." *Id.* at 361-62.

¶27. This Court has approved the following "exact narrowing instruction on the HAC aggravator":

The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders-the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered

by the victim, then you may find this aggravating circumstance.

*[Edwards v. State](#)*, 737 So. 2d 275, 315 (Miss. 1999).

¶28. The instruction this Court has approved requires, at a minimum, that the offense be a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Id.* The instruction the trial court approved is different in that it uses the disjunction "or" rather than "and" or "which is" to precede "unnecessarily torturous." The effect is to simply substitute the words "conscienceless, pitiless, or unnecessarily torturous" for the words "heinous, atrocious or cruel."

¶29. King argues that if "an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous'," so too could an ordinary person believe that every unjustified, intentional taking of human life is "conscienceless" or "pitiless." King insists that the words "conscienceless" or "pitiless" no more limit a jury's discretion than the words, "heinous, atrocious or cruel." With no limiting effect on the jury's discretion, King argues, the trial court's instruction is unconstitutionally vague.

¶30. The State contends that while the language here is somewhat different than that usually given the jury, this is still an acceptable definition of this aggravating circumstance. The State argues that there is no magic language that is required to define this aggravating circumstance.

¶31. The definition which we have previously established as an acceptable instruction is certainly not the only acceptable instruction. It remains, however, the only definition which we have approved and which has explicitly been found to pass constitutional muster. Whether the instruction used in the case sub judice is acceptable in light of the previously-approved instruction is a close call. Departing from the tried and true trail is fraught with danger. Therefore, on remand, the precise language of the previously-approved instruction should be used.

## VII.

¶32. For the aforementioned reasons, the death sentence imposed by the judgment of the Lowndes County Circuit Court is reversed, and this case is remanded to that court for a new sentencing trial consistent with this opinion.

¶33. **REVERSED AND REMANDED.**

> **PITTMAN, C.J., WALLER, COBB AND DIAZ, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. BANKS, P.J., CONCURS WITH SEPARATE WRITTEN OPINION. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION. EASLEY, J., NOT PARTICIPATING.**

> BANKS, PRESIDING JUSTICE, CONCURRING:

¶34. I concur in the result reached by the majority that this case must be reversed and remanded for a new sentencing trial because of the trial court's handling of the sympathy issue and because of its erroneous instruction on the heinous, atrocious or cruel aggravating factor. I write to explicate those areas in which I differ with the majority.

## I.

¶35. King asserts that the trial court erroneously excused several jurors from the jury venire who generally opposed the death penalty but vowed to follow the court's instructions and vote for death if warranted. Specifically, King argues that the trial court erroneously excused Louise Gray, Linda Fulton, and Tommy Clayborn.

a.

¶36. Louise Gray marked "[n]o" to the question, "could you ever personally vote to impose the Death Penalty?" When asked during general voir dire whether she could personally "impose the death penalty," Gray again responded "no." However, the prosecutor asked Gray during voir dire whether she could impose the death penalty "even if the evidence warranted." She responded that she would have to hear some evidence first. The prosecutor asked again, "are you still saying you could not impose the death penalty?" Gray responded, "[t]hat's what I'm saying cause I don't know anything about it." King argues that Gray then clearly stated that she would follow the court's instructions and could vote for a death sentence if warranted in this case.

¶37. The State moved to excuse Gray for cause. Defense counsel objected stating "I don't think the law provides whereby if you are generally opposed to the death penalty is not enough to strike a person for cause." The trial court then ruled stating "She said on her-uh-thing she's opposed to the death penalty. She said out there she was opposed to death penalty. I'm not going to let someone like that sit on the jury."

¶38. King contends that Gray was not excludable for cause. He cites *Fuselier*, where the trial court erroneously excused for cause a juror who stated as follows:

> I would have to hear the evidence before I could say for certain, but I'm not sure that I could say this man here should die... I don't think I could . Now, if it would have been somebody I knew or something like that, you know, I could probably. But, in this case, I don't believe there is any evidence with pieces missing that I could say that this man should die.

*Fuselier v. State*, 468 So.2d 45, 54 (Miss. 1985). This Court held that "the trial court clearly committed reversible error" by excusing this juror for cause. *Id*. King argues that if it is error to excuse a juror who says " I don't think I could" vote for a death sentence based on the evidence mentioned during voir dire, it was error to excuse Gray, who vowed, "[a]fter hearing the circumstances, yes, I probably could."

¶39. The test for determining when a prospective juror's views on the death penalty justify his removal is whether the trial court finds that the "juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath" and "is left with the impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt*, 469 U.S. 412, 424-25, 105 S. Ct. 844, 852-53, 83 L .Ed. 2d 841, 851-52 (1985); *Simon v. State*, 688 So.2d 791, 798-801 (Miss. 1997); *Fuselier v. State*, 468 So.2d at 53-55. To meet this test the prospective juror's response can be less than unequivocal. *See Wells v. State*, 698 So.2d 497, 501 (Miss. 1997); *Willie v. State*, 585 So.2d 660, 672-73 (Miss. 1991).

¶40. Gray answered that she could not impose the death penalty on her pre-voir dire questionnaire. Moreover, she repeated her response against the death penalty during voir dire. During questioning by the prosecution the following colloquy ensued:

> BY MR. KITCHENS: Ms. Gray, my name is Jim Kitchens and I've got a -- just a few questions to

ask. Some weeks ago you got a questionnaire in the mail and question number 47 -- I'll go straight to the heart of it, said, "In spite of your feelings as indicated above, could you ever personally vote to impose the death penalty?" And correct me if I'm wrong, but you stated that you could not impose the death penalty in that statement, is that correct?

BY MS. GRAY: Yes.

BY MR. KITCHENS: And then this morning you also when asked you raised your hand and -- and said, "I could not impose the death penalty", is that correct?

BY MS. GRAY: Yes.

Then Gray changed her response as reflected in the following colloquy:

BY MR. BURDINE [King's attorney]: If the aggravating [circumstances] says death penalty, could you impose it? Would you impose it if it's bad enough and the proof come out that the aggravation and all what went on was so bad, this person get death. Would you impose the death penalty?

BY MS. GRAY: That's hard to say. I might according to the circumstances.

BY MR. BURDINE: According to the circumstances? If the circumstances warrant -- if the circumstances -- if you chosen as a juror and you have heard the circumstances and have said, okay, no question about it, this man should be put to death, could you impose the death penalty? The circumstances we're talking about are the testimony that you haven't heard yet. Those are the circumstances you talking about isn't it?

BY MS. GRAY: Yes.

Ultimately, Gray said she would follow the court's instructions. After Gray was excused for cause, the transcript reflects as follows:

BY MR. BURDINE: If the Court pleases -- if the court please, before we go any further we would like to -- uh -- uh -- object to the Court's ruling to protect the record you Honor.

BY THE COURT: All right, your objection is noted in the record.

BY MR. BURDINE: Yes, okay. And -- and the reason -- our reason for opposing the court's ruling is I don't think the law provides whereby if you are general [sic] opposed to the death penalty is not enough to strike a person for cause.

BY THE COURT: She said on her, uh -- thing she's opposed to the death penalty. She said out there she was opposed to the death penalty. I'm not going to let someone like that sit on the --

BY MR. BURDINE: All right, sir.

BY THE COURT: -- jury.

¶41. The State argues that the preceding colloquy shows that the juror said at one moment that she could never vote for the death penalty and then says that she "probably could" vote for the death penalty. The State notes that this Court was faced with a similar group of responses in *Dufour v. State*, 453 So.2d 337

(Miss. 1984). In *Dufour*, this Court, after setting out voir dire responses similar to the ones in this case, citing *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), held that there was no error in excusing in the jurors.

¶42. The State asserts that the trial court did not abuse its discretion in holding that this prospective juror's views on the death penalty would have "prevent[ed] or substantially impair[ed] the performance of h[er] duties in accordance with h[er] instructions and h[er] oath."

¶43. It is well-settled law that it is the trial judge's domain to judge matters of credibility of a witness including prospective jurors. *Harris v. State*, 527 So.2d 647, 649 (Miss. 1988). The circuit judge, as he must, has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. *Bell v. State*, 725 So. 2d 836, 845 (Miss. 1995); *Scott v. Ball*, 595 So. 2d 848-49 (Miss. 1992).

¶44. Both parties agree that it is reversible error if one juror is erroneously excused from the jury on the basis of his view on the death penalty. *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). King notes that the U.S. Supreme Court has established a "per se rule' requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968) is eligible to serve, has been erroneously excluded for cause'." *Balfour v. State*, 598 So.2d 731, 755 (Miss. 1992) (quoting *Gray*, 481 U.S. at 659).

¶45. If the record were silent as to the standard applied in the trial court in excusing Gray, we would assume the correct standard and defer to the trial court's judgment. Here, however, the trial court stated the wrong standard for striking a juror in this situation. The trial court stated that Gray " said out there she was opposed to the death penalty. I'm not going to let someone like that sit on the jury." This is the wrong test for striking a juror for cause. The trial court must determine whether the potential juror could follow the law as instructed given even if the juror expressed a general disapproval of the death penalty. *See Wainwright v. Witt*, 469 U.S. at 424-25, 105 S.Ct. at 852-53, 83 L.Ed.2d at 851-52; *see also Simon v. State*, 688 So.2d at 798-801; *Fuselier v. State*, 468 So.2d at 53-55. Here, the record does not reflect that such determination was made by the trial court. The trial court may well have determined that the juror could not follow the law as instructed. However, the record does not reflect such a determination. Instead it reflects a different impermissible standard. Dismissing jurors because simply because they are opposed to the death penalty is error. *Fuselier*, 468 So.2d at 54. In light of the clear statement by the trial court for dismissing juror Gray, it is my view that the trial court erred in striking Gray.

b.

¶46. King next asserts that the trial court erroneously excused Linda Fulton, another potential juror. Fulton marked "[n]o" on the attorney questionnaire to the question whether she could "personally vote to impose the Death Penalty." King argues that once Fulton understood the duty of a juror she repeatedly vowed that she would follow the court's instructions and vote for a death sentence if warranted. The pertinent part of the transcript reads as follows:

BY MR. KITCHENS: Ms. Fulton -- Ms. Fulton, did you -- my -- my name is Jim Kitchens. I've got one or two -- well probably mor [sic] than that, questions. Do you recall filling out a questionnaire that was sent to you by the court asking you all kinds of stuff that probably seemed personal and you

probably didn't want to answer?

BY MS FULTON: Yes, sir.

BY MR. KITCHENS: Okay. When you -- when you filled that out, was one of your responses to that -- I -- I'm not able to put my hands on your response, but I have down that you -- that you strongly disagreed with the death penalty and you could not impose the death penalty, is that correct?

BY MS. FULTON: Yes, sir.

BY MR. KITCHENS: Okay. I -- I don't want to put words in your mouth. Is that --

BY THE COURT: That's correct.

BY MR. KITCHENS: Is that still your feeling today?

BY MS. FULTON: I can't say right now. I don't know.

BY MR. KITCHENS: Okay. Do you still strongly disagree with the death penalty?

BY MS. FULTON: Once I hear the case, I pro -- you know, I don't really know yet cause I don't know.

BY MR. KITCHENS: And you said you couldn't personally impose the death penalty in that?

BY MS. FULTON: And it -- I probably could.

Fulton did not know what changed her mind, but stated that she could follow the court's instructions and consider the death penalty. The transcript reflects as follows:

BY MR. KITCHENS: Okay. But -- but you don't know what caused you to change your mind?

BY MS. FULTON: No.

BY MR. KITCHENS: Okay. Do you -- could you follow the instructions that the court gives you?

BY MS. FULTON: Yeah, I can follow the instructions sure.

. . .

BY MR. BURDINE: If the facts said -- if you -- if you drew from the facts that he should be given the death penalty, would you -- would you vote for the death penalty?

BY MS. FULTON: If -- if I -- if I see the facts, I would.

After Fulton's responses, the transcript reads as follows:

BY MR. KITCHENS: Your Honor, we would -- we would -- uh -- move the court to strike Ms. Fulton for cause based on *Wainwright v. Witt*, *Davis v. State* and some other cases. There comes a point, judge, when the court can find that a witness is just not being truthful and -- uh -- I think she's gone from very strong feelings against it to all of a sudden for no apparent reason, now she could

impose it and -- uh -- the court as finder of fact I believe that -- uh -- this woman could not impose the death penalty.

BY MR. BURDINE: I think the Court can see through several of these witnesses here after they've sat and talked about it and give it -- give it deliberation, they can make their mind up more -- uh -- more definitely, but what seems to be running through their indecision is what would be the facts. Now there have been some saying regardless of what the facts are, I -- I could never impose it, but we've had three or four who said once I've heard the facts, yes. It is hard sometimes to make a decision on a blanket question and I think Ms. Fulton emphatically said every time they came around to her, yes, I can do it if I heard the facts.

BY THE COURT: Okay counselor, I heard it and -- uh -- I'm trying to get a jury to be here and be fair and impartial to both sides and I'm going to sustain the challenge for cause to juror number 50 for Ms. Fulton. Who's next?

¶47. The State contends that King did not make an objection, general or specific, regarding the seating of the jury or the exclusion of Fulton. While the word "object" was not used here, it is clear that King opposed the court's action in excusing Fulton.

¶48. Alternatively, the State claims that Fulton's contradictions in the answers to the questions between her questionnaire and her in-court responses were sufficient cause for the trial court to find that her views would substantially impair her duties as a juror. The State asserts that the response was very similar to those, which the Court found sufficiently equivocal to sustain a strike for cause in *Billiot v. State*, 454 So.2d 445 (Miss. 1984). There, the Court held that a juror was excludable for cause when the juror stated he would "try" to follow the court's instructions. *Id*. at 447. The State also cites to *Mack v. State*, 650 So.2d 1289, 1301-02 (Miss. 1994), for the proposition that a juror that says he or she can never vote for a death penalty then says that he or she probably could is excusable for cause.

¶49. While Fulton's final answer was not equivocal, she did give different answers at different times. Again, however, the court failed to articulate the correct standard in deciding whether to strike Fulton for cause. The court stated an objective to get jurors who could be "fair" to both sides. Its view may have been that jurors with opposition to the death penalty simply could not be "fair." This is especially a possibility when we consider the court's statement with regard to prospective juror Gray.

c.

¶50. King further asserts that the trial court erroneously excused prospective juror Tommy Clayborn. Clayborn stated on his questionnaire that he agreed with the death penalty, but marked "No" to the question, "could you ever personally vote to impose the Death Penalty?" King argues that Clayborn's responses to whether he could impose the death penalty were ambiguous.

¶51. Clayborn was excusable as a juror. Here, the juror first said that he could not vote for the death penalty, then he said he could. This is equivocal. Given this juror's equivocal stance on the issue, there was no abuse of discretion in excusing Clayborn for cause.

¶52. Nevertheless, because the answers given by Gray and Fuller were such that a trial court could accept them as willing to apply the law despite misgivings about the death penalty and because the trial court articulated an incorrect standard in arriving at the opposite conclusion, I would also reverse the trial court

for its excusing prospective jurors Gray and Fuller for cause.

## II.

¶53. King argues that he was deprived of due process of law in violation of the United States and Mississippi Constitutions when the trial court denied him the expert assistance of a pathologist while the State used expert opinion testimony by its pathologist to support its argument that this crime was "especially heinous, atrocious or cruel."

¶54. The State called an expert, Dr. Ben Martin, a pathologist, who testified that Patterson was conscious when she was killed. Dr. Martin testified to specific procedures used to show how he came to his conclusion that Patterson was conscious. Dr. Martin further testified that Patterson's injuries to her head were the result of multiple blows to the head. King was denied his own expert to rebut this testimony.

¶55. A defendant is entitled to an expert to rebut expert opinion on "crucial elements." *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed. 2d 53 (1985). A trial court has no discretion to deny expert assistance when the State presents expert testimony to prove a crucial element at the trial. *Harrison v. State*, 635 So.2d 894, 901-02 (1994).

> [W]ith the State's expert offering the only evidence on the crucial element of rape, fundamental fairness required that Harrison [the defendant] be provided an expert in pathology to rebut the testimony of McGarry [the State's expert]. At that point, no amount of lay testimony could have possibly refuted the "objective" opinion of the State's expert. Due process and fundamental fairness required the lower court to allow the defense access to an independent pathologist and sufficient time to rebut or order a mistrial. Failure to do so constitutes reversible error.

*Id*. at 902.

¶56. The State urges that it is within the trial court's "broad" discretion to deny a defendant an independent expert pathologist. It argues that King failed to assert a "substantial need" for an independent expert pathologist. *Holland v. State*, 705 So.2d 307, 333 (Miss. 1992). It contends that King's motion for an independent pathologist was nothing more than an undeveloped assertion of helpfulness to the defense and did not warrant the appointment of an independent expert in pathology.

¶57. The trial court erred in denying King an expert to prove that the murder of Lela Patterson was not "especially heinous, atrocious or cruel." Although the State's pathologist, Dr. Martin, was cross examined, arguing against an expert "from a commonsense standpoint" is no substitute for expert assistance. *Harrison*, 635 So.2d at 902.

¶58. The State argues that counsel for King was able to procure from Dr. Martin the very expert opinion testimony that he sought funds to obtain. The State argues that counsel for the defendant had adequate information to rebut the testimony of Dr. Martin and elicited favorable testimony for King during his cross-examination. Specifically, the State notes that on cross examination, when questioned by defense counsel on whether victim could have been unconscious when she was allegedly held underwater, Dr. Martin stated, "she could have, yes." The State argues that Dr. Martin's response raised an inference directly rebutting the State's assertion that the victim was conscious.

¶59. King is entitled to have an expert in his defense. This Court has held that indigent defendants are

entitled to expert assistance on crucial points of the case. A fundamental question is whether King has shown a "substantial need" for expert assistance. This Court has noted:

> This Court most recently revisited this issue in ***Harrison v. State***, 635 So.2d 894 (Miss. 1994), concerning the denial of a forensic pathology expert by the trial court. The Court reversed because the defendant's mental health was a significant factor at trial, as developed by the State on direct through its witness, Dr. McGarry. There, the defense was certainly entitled to rebut such evidence.

*Holland*, 705 So.2d at 334.

¶60. Here, the issue is whether this crime was heinous, atrocious or cruel. Like ***Harrison***, whether Patterson was conscious during the strangulation and drowning is important proof which affects whether the crime was especially heinous, atrocious or cruel. Favorable cross- examination testimony is no substitute for a defendant's own expert witness. Neither should a defendant be relegated to a fifteen-year-old affidavit taken from a former trial witness to rebut live expert testimony on a key issue in a death penalty case.

¶61. This is reversible error. As this Court has stated," [d]ue process and fundamental fairness required the lower court to allow the defense access to an independent pathologist and sufficient time to rebut or order a mistrial. Failure to do so constitutes reversible error." ***Harrison***, 635 So.2d at 902.

### III.

¶62. King contends that the trial court erred in instructing the jury that sympathy could have no part in the case. This Court has repeatedly held that, under the Eighth Amendment to the U.S. Constitution, "a jury may not be instructed to disregard, in toto, sympathy" in a capital case. [*Evans v. State*](), 725 So.2d 613, 690-91 (Miss. 1997); ***Blue v. State***, 674 So.2d 1184, 1125 (Miss. 1996); ***Pinkney***, 538 So.2d at 351.

¶63. King notes that before the parties even presented their cases, the trial court instructed the jury venire:

> Jurors must be as free as humanly possible from bias, prejudice or sympathy. None of these any part in any of your deliberation. You must be free-must not be biased, you must not be prejudiced, you're not-must not consider sympathy as part of the case.

Furthermore, King notes that in closing argument, defense counsel asked the jury for "understanding," "compassion," and "mercy." The trial court cut off this line of argument in a bench conference and said, "You can't ask for sympathy in any way." After closing argument, King notes that prior to the jury's deliberation, the trial court further instructed the jury:

> I thought I heard one of them say go back there and have sympathy. You remember when we started I instructed you that what the attorneys said was not evidence. The evidence you have to base your decision on has come from this stand and the exhibits offered and received into evidence and I told you that -- uh -- bias or prejudice or sympathy have no part in your deliberations. You recall that?
>
> (PANEL RESPONDS AFFIRMATIVELY)

¶64. King insists that no two instructions could have more clearly instructed the jury to disregard sympathy in toto than, "[y]ou... must not consider sympathy as part of this case," and "sympathy [can] have no part in your deliberations."

¶65. King argues that the trial court gave neither of the two sympathy instructions approved by this Court. In *Blue*, King notes that this Court approved an instruction that read as follows: "[Y]ou are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." 674 So.2d at 1255. "[B]ecause the instruction does not inform the jury that it must disregard in toto sympathy..., the instruction is a proper statement of the law." *Id*. King contends that the trial court's instruction violated the *Blue* standard.

¶66. Our prior pronouncements on this issue recognize the competing principles of securing a fair judgment on the issue of penalty in accordance with the evidence and not raw emotion and the goal of assuring fair consideration of any potentially mitigating factors. We have approved the general instruction admonishing the jury not to be swayed by "sympathy" unrelated to the evidence. *Willie v. State*, 585 So.2d at 677. There, the instruction stated, "[y]ou should consider and weigh any aggravating and mitigating circumstances,... but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." *Id*. at 677. But we have guarded against any overemphasis of the anti-sympathy admonition so as not to fetter unduly reasoned consideration of factors offered as mitigating. We do this in full recognition of the fact that the line between a rational and an emotional response is often blurry.

¶67. The path that we have carefully established was deviated from here. This is all the more so because coming as it did at the close of oral argument just before the jury retired to deliberate and after the State had ample opportunity in closing to respond to the defendant's arguments, the court's decision to single out one aspect of its prior instructions took on an adversary tone which may have placed the judge on the side of the prosecution in the eyes of the jury. This was improper. "We have made clear that we will not hesitate to reverse where the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution." *Layne v. State*, 542 So.2d 237, 242 (Miss.1989). We have also recognized that " [i]t is a matter of common knowledge that jurors . . . are very susceptible to the influence of the judge . . . jurors watch his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict." *Thompson v. State*, 468 So.2d 852, 854 (Miss. 1985).

¶68. In my view, the trial court's handling of the sympathy matter constitutes reversible error. I do not, however embrace the majority's suggestion that the "send a message" argument is equally permissible in the sentencing stage. As to that part of the majority opinion, I adhere to the views expressed in my opinion concurring in part and in the judgment in *Humphrey v. State*, 759 So. 2d 368, 387-90 (Miss. 2000).

### SMITH, JUSTICE, DISSENT ING:

¶69. The majority opines that reversible error exists because the jury was instructed, in toto, to disregard sympathy in their deliberations. Sympathy is not mentioned anywhere by the judge in the written instructions that were read to the jury. In preliminary remarks to the jury, the judge stated that you "must not be biased, you must not be prejudiced, you must not consider sympathy as part of this case." Later, before deliberation, the judge reminded the jury of his earlier statement that "bias, prejudice, and sympathy have no part in . . . deliberations." Because this comment by the judge was not a part of the written instructions given to the jury, I find the error, if any, to be harmless.

¶70. In *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct., 108 L. Ed. 2d 415 1257 (1990), the United States Supreme Court considered whether a jury instruction violated the constitution. At trial, after the jury was

instructed that they must consider all of the mitigating circumstances, the following instruction was given:

> You are the judges of facts. The importance and worth of the evidence is for you to determine. You *must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence*.

> You should discharge your duties as jurors impartially, conscientiously and faithfully under oaths and return such verdict as the evidence warrants when measured by these Instructions.

*Saffle*, 494 U.S. at 487, 110 S.Ct. at 1259. (emphasis added.). The Supreme Court found that there was no constitutional violation in this instruction.

¶71. In *Saffle*, the defendant argued that jurors are allowed to base their sentencing decision upon sympathy that they feel for the defendant after hearing his mitigating evidence. *Id.* at 489, 110 S.Ct. at 1260-61. For this reason, Parks argued that the anti-sympathy instruction that was given may prevent jurors from considering the mitigating evidence altogether. *Id.* at 492, 110 S.Ct. at 1262. The Court disagreed with this argument and held that "[t]his argument misapprehends the distinction between allowing the jury to consider mitigating evidence and guiding their consideration." "It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary." *Id*. at 493, 110 S.Ct. at 1263.

¶72. As in *Saffle*, the jurors in the case at bar were first instructed that they "must consider mitigating circumstances. Therefore, even if all other eleven jurors find that a certain mitigating circumstance does not exist, if you believe it does exist, you must find that mitigating circumstances [sic] and weigh it in your further deliberation." Since the juror were instructed that they were to consider all of the mitigating circumstances, the comment regarding sympathy only provided guidance for those considerations.

¶73. Similarly, in *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L. Ed. 2d 934 (1987), the Supreme Court was faced with deciding if an instruction that told the jury not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" violated the constitution. *Id.* at 542, 107 S.Ct. at 839. The Court held that it was "highly unlikely that any reasonable juror would almost perversely single out the word 'sympathy.'" There were other nouns like conjecture, passion, prejudice, public opinion, and public feeling. *Id.* at 543, 107 S.Ct. at 840. The Court held that, when read the instruction as a whole, it is "no more than a catalog of the kind of factors that could improperly influence a juror's decision to vote for or against the death penalty." *Id.*

¶74. In the case at bar, the jury was instructed not to consider bias, prejudice, or sympathy in their deliberations. I find this "instruction" to be the same type of list that was provided in *Brown*. It was no more than a list of factors that could improperly influence the jury's decision. As the Supreme Court pointed out, the State may not cut off the jury's full consideration of mitigating evidence; however, it need not grant the jury the choice to make their decision based on their own "whims or caprice."

¶75. In this case, the jury was properly told, in a written instruction, to consider all of the mitigating circumstances. It is important to note that the comments regarding sympathy were not included in any of the written instructions. "It is presumed that jurors follow the instructions of the court." *Payne v. State*, 462 So.2d 902, 904 (Miss. 1984); *Whitlock v. State*, 419 So.2d 200 (Miss. 1982); *Holifield v. State*, 275

So.2d 851 (Miss. 1973). Additionally, our Court has held that "[e]rror is reversible only where it is 'of such magnitude as to leave no doubt that the appellant was unduly prejudiced.'" *Estate of Mask v. Elrod*, 703 So.2d 852, 859 (Miss. 1997) (quoting *Davis v. Singing River Elec. Power Ass'n*, 501 So.2d 1128, 1131 (Miss. 1987)). Therefore, I find the error in the judge's statement, if any, to be harmless.

¶76. For these reasons, I respectfully dissent.