# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-01637-SCT

*TONNIE L. THOMAS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/28/2008 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE T. KELLY, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | W. DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/26/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     Tonnie Thomas was convicted of murder[1] and first-degree arson[2] and sentenced to life without parole as a habitual offender under Mississippi Code Section 99-19-83. He argues the trial court erred in admitting two statements in violation of his Fifth-Amendment right against self-incrimination and his Sixth-Amendment right to counsel, and in denying a

---

[1]Miss. Code Ann. § 97-3-19 (1) (Rev. 2006).

[2]Miss. Code Ann. § 97-17-1 (Rev. 2006).

directed verdict on each charge. Finding no merit in the errors raised, we affirm the convictions for murder and arson.

## FACTS

### Testimony and Evidence Admitted at Trial

¶2.     On March 1, 2007, the police and fire department responded to a house fire at 619 Silver Street in Greenville, Mississippi. Once the fire was extinguished, the responders discovered a body, later identified as that of Louis Harris, located in the kitchen. Expert testimony established that the fire was the result of six separate fires intentionally set in various locations of the house.

¶3.     Harris's body was located under a pile of debris, and various surfaces of the body were charred. Dr. Steven Hayne, a pathologist, testified that the burns had occurred after death. The body also had puncture wounds at multiple sites, including the face and neck. Dr. Hayne stated that Harris's death was caused by a puncture wound to the neck, which led to massive external blood loss.

¶4.     Ursula Fowler, Harris's neighbor, testified that she had seen Harris that morning, standing alone on the steps of his house. Later that evening, she heard a commotion, like fighting, that lasted about fifteen minutes. Approximately ten to twenty minutes later, a man knocked on her door to alert her that Harris's house was on fire. Fowler testified that she had witnessed violent arguments between Harris and his girlfriend, Laquanda Gilmore, but that she had not seen Gilmore at Harris's house that day or during the week prior.

2

¶5.     Investigator Dondi Gibbs responded to the scene and took photographs showing blood splatters throughout the house. He also collected from the scene blood samples that he sent to the Mississippi Crime Laboratory for DNA testing. Gibbs testified that it appeared a struggle had occurred, since the home was in disarray, with furniture thrown about. Gibbs also testified that he had returned to the home on March 9 to collect more evidence, including two shirts stained with blood and a VCR box.

*First Statement*

¶6.     The police department developed Thomas as a suspect, and on Friday, March 2, 2007, Thomas turned himself in to the police. Gibbs took an unrecorded statement[3] from Thomas that Friday because Thomas needed medical attention for some "severe injuries" and had a "loud odor" of alcohol on his person. Gibbs stated that Thomas told him, "Yeah, I killed that punk bitch. I was feeding him money, marijuana, and my crack, and he wouldn't give my money. He bought a [VCR] and he couldn't give me my money." Thomas was then taken to the hospital, where he received medical attention. Thomas suffered from a bite mark on his face, with a stab wound below it, a scratch mark under his right eye, a stab wound on his upper right lip, a cut on his inside right palm, and a stab wound in his left leg.

---

[3]Facts relevant to this statement will be discussed in more detail under Thomas's first assignment of error. Gibbs provided more detailed testimony concerning the first statement at the suppression hearing.

*Second Statement*

¶7.     Gibbs testified that on Saturday, March 3, 2007, Thomas gave a second, recorded statement.[4] The recording was played for the jury, and a transcript of the recording also was admitted into evidence.  In his second statement, Thomas stated that he had been living with Harris, and that on March 1, 2007, he had confronted Harris about a $65 debt for marijuana. Harris had just bought a VCR and had told Thomas that he did not have the money. According to Thomas, Harris then started "talking crazy and laughing" and swung at him with a hammer.  Thomas stated that he and Harris began to fight in the bedroom, and that their fight continued into the living room and kitchen.  While fighting with Harris, Thomas pulled a knife out of his pocket and eventually stabbed Harris in the kitchen.  Thomas stated that he had blood on his hands and head, and that he had washed it off before he left the house.  Thomas denied setting the house on fire.

*Third Statement*

¶8.     On March 8, 2007, Thomas requested to speak with an investigator and gave a third statement to Investigator Jerome Jackson.  A tape and transcript of this recording were admitted into evidence.  In this statement, Thomas denied that he had killed Harris.  Thomas stated that he had witnessed another person stab and kill Harris, but that he was afraid his family would be hurt if he disclosed the killer's identity.

---

[4]This statement will be discussed in more detail under Thomas's first assignment of error.

4

***Fourth Statement***

¶9.     On March 28, 2007, Thomas requested to speak with Investigator Timothy Elzy, and Elzy witnessed a fourth statement. Elzy testified that he twice administered ***Miranda***[5] warnings before Thomas gave the fourth statement. Elzy testified that Thomas refused to be recorded but that Thomas wanted to tell him where to find the murder weapon. Thomas informed Elzy that after he had left the house, he had pushed the knife, blade down, into the ground. After receiving this information, Elzy tried to locate the knife with a metal detector but could not find it.

¶10.     The jury also heard testimony from Dwana Broughton, a crime-scene analyst with the Mississippi Bureau of Investigation. Broughton had taken various photographs of the scene and had collected a hammer and wallet that was on top of the body. She also had collected eighteen swabs of what had appeared to be blood from throughout the residence. She had submitted all evidence except the wallet to the crime lab for further analysis.

¶11.     William Jones testified as an expert in the field of forensic science, specializing in DNA analysis and bioscience and statistical analysis. Jones had analyzed the evidence from the scene to determine if it had contained any blood from Thomas or Harris. Jones testified that the hammer had tested negative for human blood, but that extreme temperatures and soot from the fire could have affected the test result. Jones also testified that he had compared samples of Thomas's and Harris's DNA with samples from the swabs and had found a match

---

[5]***Miranda v. Arizona***, 384 U.S. 436, 467-68, 471, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

5

for Thomas on swabs from two locations: the east living-room wall, and a kitchen door. He also had found a match between Harris's blood sample and swabs from the bedroom chair, south living-room wall, east living-room wall, bedroom door frame, bedroom door, north bedroom wall, kitchen chair, and two kitchen doors. Jones also had tested the two shirts and had found Harris's blood on one and a mixture of Harris's and Thomas's blood on the second.

## DISCUSSION

**I.     Whether the trial court erred in admitting Thomas's statements.**

¶12.    Prior to trial, Thomas moved to suppress his statements taken March 2 and 3, 2007. The trial court held a hearing on the motion to suppress, and heard testimony from all officers who had witnessed each statement, as well as Thomas.

*Suppression Hearing Testimony Relating to March 2, 2007, Statement*

¶13.    At the motion-to-suppress hearing, Gibbs testified that Thomas had turned himself in and had been arrested for two contempt-of-court warrants. After Thomas was placed in Gibbs's custody, Gibbs had brought Thomas to his office and had begun to ask Thomas the identifying questions located at the top of the ***Miranda*** form, including questions concerning name, address, phone number, highest level of education completed, last school attended, ability to read or write, and whether the defendant understands what an attorney is.

6

¶14.    As Gibbs was asking Thomas these preliminary questions, Thomas had interrupted Gibbs and stated that he "may need" to talk to a lawyer.[6]  After Thomas had made this statement, Sergeant Michael Merchant had entered the room, and Merchant, Gibbs, and Thomas had moved to a bigger office.  Gibbs stated that Lieutenant Xavier Redmond also had entered the bigger office.

¶15.    Gibbs stated that he had known Thomas since Thomas was a juvenile and that he had began discussing Thomas's past run-ins with the law.  Gibbs denied that he had asked Thomas any questions about the homicide or arson investigation, but he admitted that he had told Thomas "it would be a lot easier on everybody if he [Thomas] would just go ahead on and cooperate." Gibbs stated that he had smelled alcohol on Thomas, but that Thomas had appeared to fully understand their conversation.  Gibbs also testified that Thomas had "pretty severe cuts, lacerations, a bite mark on his face, and he was . . . in a lot of pain."

¶16.    Prior to being *Mirandized,* and during the course of their conversation, Thomas had abruptly stated, "I'm going to go on and tell you, I killed that punk bitch."  Gibbs then read Thomas his *Miranda* warnings, and Thomas indicated he understood and signed the waiver form.  After Thomas had waived his rights, he gave a statement of the events leading to Harris's death and admitted that he had stabbed Harris in the head approximately four or five times.

---

[6]On cross-examination, Gibbs admitted that, at the preliminary hearing, he had testified that Thomas wanted to speak to an attorney.  Gibbs stated that he was not asked at the preliminary hearing to relay Thomas's exact words.

¶17. Gibbs stated that he did not record this statement, because Thomas was "in an extreme amount of pain" and wanted medical treatment. Thomas told Gibbs that he would give a second statement after he received medical attention. However, Gibbs denied that he had promised Thomas medical attention in exchange for any statement. After providing the first statement, Thomas was transported to the hospital, where he received medical treatment.

¶18. Merchant, Gibson, and Redmond also testified at the suppression hearing. Each officer testified that Thomas had not appeared to be intoxicated. Merchant and Redmond also testified that they did not recall anyone asking Thomas about the homicide or arson before Thomas admitted to killing Harris. Redmond and Gibson testified that neither officer had heard anyone promise Thomas anything in exchange for a statement.

¶19. Thomas testified that, because he had heard the police were looking for him, he had turned himself in to the police department. Thomas stated that Gibbs, Elzy, and Redmond had taken him into a room where Gibbs had told Thomas that he wanted to talk about Louis Harris. Thomas testified that at that point, he had told Gibbs he wanted to "take the Fifth" until he could meet with an attorney. According to Thomas, Redmond stated "the truth will set you free." Thomas also testified that Gibbs had opened a law book and had read him the maximum and minimum sentences for murder and had told him to cooperate. Thomas stated that he had admitted to killing Harris because he was in pain from his wounds and the officers had told him they would make it easy for him. However, Thomas admitted that no one promised him anything in exchange for his confession.

8

*Suppression Hearing Testimony Relating to March 3, 2007, Statement*

¶20.   At the motion-to-suppress hearing, Gibbs testified that he had gone to the station on Saturday, March 3, 2007, and had instructed Elzy to get Thomas from his cell for a statement. Gibbs testified that Thomas had been upset about conditions at the jail, and it had taken approximately ninety minutes for Thomas to calm down. After Thomas had calmed down, he had told Gibbs that he would give a statement. Gibbs had then read Thomas his ***Miranda*** rights, and Thomas had signed a waiver form. Thomas had then given a statement, which was recorded and witnessed by Gibbs and Elzy. Thomas again admitted to killing Harris and recounted the events surrounding Harris's death, but he denied the arson. After Gibbs had obtained this second statement, he charged Thomas with murder and arson. Elzy testified at the suppression hearing, and his testimony corroborated Gibbs's testimony.

¶21.   Thomas testified that he did not request to see Gibbs on Saturday, March 3, 2007. Thomas stated that Elzy had brought him to Gibbs's office, and Gibbs had instructed him to sign some papers and to talk about what had happened.

*Analysis*

¶22.   Thomas argues that the trial court erred in allowing into evidence his March 2 and March 3 statements, claiming that he affirmatively had asserted his right to remain silent and his right to counsel on March 2, 2007. Thomas argues he was intoxicated and in need of medical attention when he provided the first statement. Thomas further argues that the police impermissibly initiated the second interrogation, which resulted in his second statement. He

9

expressly denies any error regarding the admission into evidence of his subsequent statements to Investigators Jackson and Elzy.

¶23. Findings by a trial court that a confession is voluntary and admissible are findings of fact, and "[t]his Court will reverse a trial court's denial of a motion to suppress only if the ruling is in manifest error or contrary to the overwhelming weight of the evidence."[7] In this case, the trial court issued a detailed order denying Thomas's motion to suppress. The trial court specifically found that Thomas was not a credible witness. The trial court found that Thomas had made an ambiguous and equivocal request for an attorney, and that Thomas voluntarily had admitted to the murder prior to any questioning about the murder and arson. The trial court also found that the police had read Thomas his *Miranda* rights and Thomas had signed a waiver prior to any questions concerning the investigation. The trial court also found that Thomas clearly had waived his *Miranda* rights before providing a second statement on March 3, 2007.

¶24. In *Miranda v. Arizona*,[8] the United States Supreme Court held that, under the Fifth Amendment, a person subjected to custodial interrogation must first be informed of his right to remain silent and right to counsel. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."[9]

---

[7] *Barnes v. State*, 30 So. 3d 313, 316 (Miss. 2010).

[8] *Miranda*, 384 U.S. at 467-68, 471.

[9] *Id.* at 473-74.

10

Likewise, "[i]f the individual states he wants an attorney, the interrogation must cease until an attorney is present."[10] Furthermore, a defendant's request for counsel must be clear and unambiguous in order for an officer to stop questioning the suspect.[11] If a custodial statement is given outside the presence of an attorney, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."[12] Additionally, "the voluntariness of a waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances."[13] We have found "that a defendant may waive his Sixth Amendment right to counsel when he waives his *Miranda* rights."[14]

¶25. As noted by this Court in *Culp v. State*, *Miranda* warnings must be given prior to *custodial interrogation*.[15] "To be subject to 'custodial interrogation' one must be both in

---

[10]*Id.* at 474.

[11]*Davis v. U.S.*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

[12]*Miranda*, 384 U.S. at 475.

[13]*O'Halloran v. State*, 731 So. 2d 565, 570 (Miss. 1999).

[14]*Mettetal v. State*, 602 So. 2d 864 (Miss. 1992). We note that while Thomas argues a Sixth-Amendment violation, his argument properly falls within the procedural safeguards of *Miranda*. We recognize that Thomas was in custody on unrelated charges, but his Sixth-Amendment right to counsel is offense-specific and had not attached in this case at the time he made his first statement regarding Harris's murder. *See generally Balfour v. State*, 598 So. 2d 731, 740 (Miss. 1992).

[15]*Culp v. State*, 933 So. 2d 264, 273 (Miss. 2005).

custody and undergoing interrogation."[16]   In *Rhode Island v. Innis*, the Supreme Court defined "interrogation" to mean "not only express questioning, but also any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[17] As noted by the Court in *Innis*, the "*Miranda* safeguards" are to protect against "coercive police practices."[18]

¶26.   It is undisputed that on March 2, 2007, Thomas admitted to killing Harris before the police had administered his *Miranda* warnings.  Additionally, Thomas asserts that he had invoked his right to silence and his right to counsel prior to being *Mirandized*.  However, the trial court made a factual finding that Thomas was not a credible witness and discounted his version of events.  No officer testified that Thomas had invoked his right to silence or right to an attorney.  Investigator Gibbs testified that Thomas had stated that he "may" need an attorney.  We find that the trial court, as the trier fact, was not in manifest error in believing the officers rather than Thomas, and in finding that Thomas did not make an unequivocal request for an attorney under *Davis v. U.S.*  Therefore, we affirm the trial court's finding that Thomas did not assert his right to silence or counsel on March 2, 2007.  Consequently, we

---

[16]*Id.*

[17]*Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

[18]*Id.*

12

find no violation of Thomas's right to counsel or silence when the police took Thomas from his cell on Saturday before he gave his second statement.

¶27.　　Because Thomas's first statement[19] was made while in custody on unrelated charges and prior to being given his *Miranda* warnings, we must examine whether the police should have known that their words and actions likely would produce an incriminating response.[20] Thomas argues that he confessed because he wanted medical attention, and Investigator Gibbs told him it would be easier if he would cooperate. In *Willie v. State*, we considered a similar statement to the one at issue here.[21]　In *Willie*, the sheriff *Mirandized* the defendant and then told him that "it would be best or better for [the defendant] to tell the truth[.]"[22]　On appeal, the Court considered whether the sheriff's statement was an exhortation to tell the truth or an inducement.[23] The Court looked at the "specific circumstances surrounding the confession[,]" and concluded that defendant was not induced to confess. *Id.*　In reaching its decision, the Court noted that the defendant was an adult who was familiar with the justice system; that any trust in the interrogation officers "emanated from past dealings . . . not a

---

[19]"I'm going to go on and tell you, I killed that punk bitch."

[20]*Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

[21]*Willie v State*, 585 So. 2d 660, 668 (Miss. 1991), *overruled on other grounds by King v. State*, 784 So. 2d 884 (Miss. 2001).

[22]*Id.*

[23]*Id.*

13

friendship or personal relationship"; and that the officers had not made any promises to the defendant.[24]

¶28. While the defendant in *Willie* had been *Mirandized* prior to confessing, we find that our analysis of the "specific circumstances surrounding the confession[,]" in the instant case is like that in *Willie*.[25] Notably, the record shows that Thomas is an adult male with a criminal record and who clearly was familiar with the justice system at the time of his arrest. The record shows that Thomas was familiar with Investigators Gibbs and Redmond through past dealings with the police, and not through any "friendship or personal relationship." *Id.* Thomas also testified that no officer had promised him anything in exchange for his confession. We also find it relevant that Thomas voluntarily had turned himself in to the police.

¶29. However, this Court must also take into account the fact that Thomas smelled of alcohol and suffered from various injuries. This Court has ruled that the "'admissibility of a confession depends upon the degree of intoxication.'"[26] Further, this Court has excluded

---

[24]*Id.*; *see also* **Ruffin v. State**, 992 So. 2d 1165, 1172 (Miss. 2008) ("Whether an interrogator's statement is a mere exhortation or an inducement generally depends on the circumstances surrounding the confession, such as the defendant's youth, good reputation, lack of familiarity with the criminal justice system, and relationship with or trust in the interrogating officer(s).").

[25]*Willie*, 585 So. 2d at 668.

[26]*O'Halloran v. State*, 731 So. 2d 565, 571 (Miss. 1999) (quoting **Johnson v. State**, 511 So. 2d 1360, 1365 (Miss. 1987)).

14

a confession only when a defendant was so intoxicated that he was in a state of mania.[27]

While Gibbs testified that Thomas had smelled of alcohol, he also stated that Thomas had not been intoxicated. The other officers also testified that Thomas had not appeared intoxicated. While Thomas was injured, he had incurred these injuries the day before, when fighting with Harris. Thomas could have sought medical attention before turning himself in. Under the "specific circumstances surrounding the confession[,]" we do not find that the police induced Thomas's confession.[28] Therefore, we find that the March 2, 2007, statement was voluntary, and "[v]olunteered statements of any kind are not barred by the Fifth Amendment[.]"[29]

¶30. Immediately after Thomas confessed[30] on March 2, 2007, Investigator Gibbs gave Thomas his *Miranda* warnings, and Thomas signed a waiver before providing a detailed statement and confession. Furthermore, Investigator Gibbs again gave Thomas his *Miranda* warnings and Thomas signed a second waiver prior to his March 3, 2007, statement. We find the trial court did not commit manifest error in finding Thomas voluntarily had waived his *Miranda* rights, nor was the trial court's finding against the weight of the evidence. We

---

[27]*Id.* (citing *State v. Williams*, 208 So. 2d 172 (Miss. 1968)).

[28]*Willie*, 585 So. 2d at 668.

[29]*Miranda*, 384 U.S. at 478, 471.

[30]We again are referring to Thomas's statement: "I'm going to go on and tell you, I killed that punk bitch."

uphold the trial court's ruling that both statements were admissible and that there was no violation of the Fifth Amendment.

**II.    Whether the trial court erred in denying Thomas's motion for a directed verdict on the murder charge.**

¶31.    A motion for directed verdict challenges the sufficiency of the evidence, and "the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]'"[31]  In judging the sufficiency of the evidence, "the trial judge is required to accept as true all evidence that is favorable to the State, including reasonable inferences that may be drawn therefrom, and to disregard evidence favorable to the defendant."[32]

¶32.    Thomas argues that the trial court should have granted his motion for directed verdict under *Weathersby v. State*.[33]  In support of his argument, Thomas asserts that he was the only witness to the crime, and that he "consistently" had stated that he killed Harris in self-defense.  The State, however, argues that the *Weathersby* Rule does not apply and points to Thomas's conflicting statements.

¶33.    In *Weathersby v. State*, this Court ruled that:

---

[31]*Jones v. State*, 904 So. 2d 149, 153 (Miss. 2005) (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968)).

[32]*Clemons v. State*, 460 So. 2d 835, 839 (Miss. 1984).

[33]*Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933).

16

[W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.[34]

"A defendant who [meets] the *Weathersby* Rule [is] entitled to a directed verdict of acquittal."[35] However, the *Weathersby* Rule is inapplicable where the defendant provides "conflicting versions of how the killing took place, or initially denies the act."[36]

¶34.    In this case, Thomas provided conflicting statements of how the killing took place. Thomas initially confessed that he had stabbed Harris during a fight. Thomas later provided a statement in which he denied killing Harris but stated that he had witnessed another person murder Harris. Therefore, the *Weathersby* Rule is inapplicable to this case.

---

[34]*Id.* at 482.

[35]*Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989).

[36]*Id.*

¶35. Additionally, the State presented evidence of each element of the murder[37] charge. The jury had before it two confessions in which Thomas admitted that he had confronted Harris about a $65 debt and then had killed Harris by stabbing him in the head. Dr. Hayne testified that Harris had multiple puncture wounds in the head and neck and had died from massive blood loss. Jones testified that both Thomas's and the decedent's blood were on parts of the house and clothing located at the scene. Harris's neighbor testified that she had heard fighting coming from the home, which explained the home's disarray. We find the trial court did not err in denying the directed verdict, as the State proved beyond a reasonable doubt that Thomas murdered Harris.

---

[37]Thomas was indicted for murder under Mississippi Code Section 97-3-19(1). The jury was instructed under subsections (a) and (b) of Section 97-3-19(1), which provides that:

> (1) The killing of a human being without authority of law by any means or in any manner shall be murder in the following cases: (a) When done with deliberate design to effect the death of the person killed, or of any human being; (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]

Miss. Code Ann. § 97-3-19(1)(a)-(b) (Rev. 2006).

**III.    Whether the trial court erred in denying Thomas's motion for directed verdict of the arson charge.**

¶36.    Thomas argues there is no evidence that he is guilty of the arson[38] charge, and as such, the trial court erred in denying his motion for directed verdict. Conversely, the State argues that there was sufficient evidence that Thomas was present in the home near the time the fires started, and there was evidence that the fires were the result of arson.

¶37.    The State's case was based on circumstantial evidence. In circumstantial-evidence cases, "the state is required to 'prove the accused's guilt not only beyond a reasonable doubt, but to the exclusion of every other hypothesis consistent with innocence.'"[39] However, "a circumstantial evidence conviction will not be disturbed [on appeal] unless it is opposed 'by a decided preponderance of the evidence.'"[40] While Thomas did not confess to the arson, he admitted that he had been living with Harris at 619 Silver Street and that he had killed Harris. Ursula Fowler, Harris's neighbor, testified that she had heard fighting at the home and within ten or twenty minutes, the home had been on fire. Therefore, the testimony of Harris's neighbor, along with Thomas's confession, place him at the scene during the time the fire

---

[38]Thomas was indicted under Mississippi Code Section 97-17-1, which provides that: "Any person who willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any dwelling house, whether occupied, unoccupied or vacant . . . shall be guilty of arson in the first degree[.]" Miss. Code Ann. 97-17-1(1) (Rev. 2006).

[39]*Leflore v. State*, 535 So. 2d 68, 70 (Miss. 1988) (quoting *Guilbeau v. State*, 502 So. 2d 639, 641 (Miss. 1987)).

[40]*Stokes v. State*, 518 So. 2d 1224, 1227 (Miss. 1988) (quoting *Kitchens v. State*, 300 So. 2d 922 (Miss. 1974)).

began and with a motive for setting the fire. Furthermore, various witnesses testified that debris had been piled on top of the body, and Broughton testified that a hammer had been placed on the body. Last, it was undisputed that the fire was the result of six separate fires that were intentionally set. Therefore, we affirm the trial court's denial of a directed verdict, since sufficient evidence (which is unopposed by a preponderance of the evidence) supports the arson conviction.

## CONCLUSION

¶38.   We find that the trial court did not commit manifest error in admitting Thomas's statements from March 2, 2007, and March 3, 2007. We also find that sufficient evidence supports Thomas's convictions of murder and first-degree arson. We affirm Thomas's conviction and sentence of one count of murder and one count of first-degree arson.

¶39.   **COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT, AS AN HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PAROLE OR PROBATION, AFFIRMED. COUNT II: CONVICTION OF FIRST DEGREE ARSON AND SENTENCE OF LIFE IMPRISONMENT, AS AN HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PAROLE OR PROBATION, AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**