61 So.3d 950 (2011)
Tony ELLIOTT a/k/a Tony Elliot, Appellant
v.
STATE of Mississippi, Appellee.
No. 2009-KA-01516-COA.
Court of Appeals of Mississippi.
April 19, 2011.
*951 Leslie S. Lee, Jackson, Sharon Anglin Counts, attorneys for appellant.
Office of the Attorney General by Laura Hogan Tedder, attorney for appellee.
EN BANC.
IRVING, P.J., for the Court:
¶ 1. This appeal arises out of Tony Elliott's conviction, in the Pike County Circuit Court, for armed robbery, conspiracy to commit armed robbery, receipt of stolen property, and conspiracy to receive stolen property.[1] Elliott was sentenced to twenty-five years in the custody of the Mississippi Department of Corrections for the armed robbery, and to five years for each of the other convictions, with the sentence *952 for the conspiracy to commit armed robbery to run consecutively to the sentence for armed robbery and the sentence for receipt of stolen property to run consecutively to the sentence for conspiracy to commit armed robbery. However, the circuit court suspended the imposition of all but the twenty-five-year sentence and sentenced Elliott to five years of post-release supervision. Feeling aggrieved, Elliott appeals and contends that: (1) his indictment is fatally defective; (2) the circuit court lacked jurisdiction over crimes that took place in Louisiana; (3) the circuit court's judgment is against the overwhelming weight of the evidence and insufficient evidence exists to support the judgment; (4) the circuit court erred in allowing testimony regarding extraneous bad acts; (5) the prosecutor committed prosecutorial misconduct; and (6) cumulative errors deprived Elliott of his right to a fair trial.
¶ 2. We agree that the circuit court was without jurisdiction over the crime of conspiracy to commit the crime of receipt of stolen property that occurred solely in Louisiana.[2] Therefore, we affirm in part and reverse and render in part the judgment of the circuit court.

FACTS
¶ 3. Elliott, Travis Andry, and Walter Wilson met in Louisiana and decided to steal a vehicle, specifically a black Jeep that was located in Louisiana. The trio stole the Jeep together and drove it to Pike County, Mississippi. Once in Mississippi, they stayed at a hotel and visited an apartment complex in McComb, Mississippi. According to Wilson, who testified at trial, the trio played a gamed of dice at the apartment complex and discussed which vehicle to steal later. After they finished playing dice, the men left and went back to their hotel. Later the same night, they returned to the apartment complex.
¶ 4. Late that night, Melissa Martin was asleep in her apartment when someone knocked at her door. Melissa looked outside and recognized Andry, whom she had known for about six months. Andry stated that he needed to use the restroom, and Melissa let him in. Wilson was with Andry and also entered Melissa's apartment. Wilson also asked to use the restroom and went upstairs, ostensibly to do so. At that time, Andry was in Melissa's kitchen, and Melissa was on the couch in her living room. According to Melissa, her apartment door was opened by someone outside the apartment. The entryway's screen door was still closed, but Andry walked to the door and opened it. At that time, Elliott entered the apartment. Melissa did not know Elliott, and he was wearing a mask. Melissa stated that Elliott had a gun and that he pointed it at her and told her to shut up or he would shoot her.
¶ 5. When Andry exited the kitchen, Melissa noticed that he was holding a gun, which she had not seen when he entered the apartment. Andry and Elliott proceeded to question Melissa as to the owner of a yellow Mustang outside. The vehicle belonged to Jeffrey Hudson, who was dating Melissa's sister, Tabitha, at the time. Hudson was upstairs asleep when Andry, Elliott, and Wilson entered the apartment. The group eventually went to the Mustang, broke a window on it, entered the vehicle, and damaged the steering column.
¶ 6. At trial, Melissa testified that she believed that Andry and Elliott wanted the Mustang; when questioned by Elliott's attorney as to whether she remembered *953 agreeing with the police that the men seemed to want something other than the car, Melissa denied that had happened. Melissa's pretrial statement to the police was played for the jury. Elliott's statement to the police shortly after the incident was also played. In that statement, Elliott acknowledged that Andry was going to pop the ignition on the Mustang in order to steal it. Elliott remained silent while the officer questioning him recited what had happened during the robbery at the apartment. When the officer questioned Elliott regarding the guns that were used during the robbery, Elliott stated that he "didn't think" that those guns were the ones that they had taken to the apartment. Essentially, Elliott acknowledged that Andry was going to steal the Mustang and that they had taken guns to the apartment.
¶ 7. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Indictment
¶ 8. In his first contention of error, Elliott argues that the portion of the indictment that charged him with conspiracy to possess stolen property was fatally unclear; therefore, he could not tell whether he was being charged with conspiracy to possess stolen property or conspiracy to commit grand larceny. This contention of error is moot, as we are reversing that conviction on other grounds.

2. Jurisdiction
¶ 9. In his second contention of error, Elliott argues that the circuit court lacked jurisdiction to try him for the crime of conspiracy to possess stolen property, because any conspiracy that occurred happened in Louisiana. We agree.
¶ 10. The indictment against Elliott alleged in Count IV that Elliott, Wilson, and Andry had "conspire[d] and agree[d] each with the other ... to ... commit the crime of possession of stolen property" on November 9, 2006. Neither the indictment nor the instructions presented to the jury indicated whether the stolen property at issue was the black Jeep or the yellow Mustang. However, Count III of the indictment, which charged Elliott and the others with possession of stolen property, referenced only the black Jeep. Looking at the indictment as a whole, it appears that Count IV was intended to apply to the conspiracy to steal the Jeep.
¶ 11. From the record, it is clear that the conspiracy to steal the Jeep occurred wholly in Louisiana by and between Elliott and the others while they were in Louisiana. There is nothing in the record to indicate that any of the three men were in Mississippi at any point during the conspiracy to steal the Jeep. At trial, Wilson testified that he was from Harvey, Louisiana and that Andry drove to Harvey, where Elliott and Wilson were at the time. When asked what they did in Harvey, Wilson stated that they "got another car" in Harvey. Wilson described the vehicle as a Jeep, and he stated that he, Elliott, and Andry all stole the Jeep together.
¶ 12. "[T]he crime of conspiracy is complete when two or more people enter into a `common plan and knowingly intend to further its common purpose.'" Berry v. State, 996 So.2d 782, 789 (¶ 21) (Miss.2008) (quoting Sanderson v. State, 883 So.2d 558, 560 (¶ 8) (Miss.2004)). Stated differently, "[t]he crime of conspiracy is complete when there is evidence of an agreement." Id. (citing State v. Thomas, 645 So.2d 931, 933 (Miss.1994)). However, as we will discuss shortly, some Mississippi cases have *954 found continuing jurisdiction for a conspiracy even after the conspirators formed an agreement.
¶ 13. The State presents two arguments in opposition to Elliott's. First, the State contends that this issue was waived due to Elliott's failure to raise it below. Second, the State argues that the conspiracy to possess the stolen Jeep continued into Mississippi. As to the former, we note that the "question of jurisdiction may [generally] be raised at any time." State v. Rogers, 241 So.2d 346, 347 (Miss.1970) (citing Brasham v. State, 140 Miss. 712, 106 So. 280 (1925)). Therefore, it is of no moment that Elliott failed to raise the question of jurisdiction in the circuit court. As to the latter, we find the cases touching on jurisdiction and the continuation of a conspiracy to be distinguishable from the present case.
¶ 14. In Taylor v. State, 682 So.2d 359, 362 (Miss.1996), the Mississippi Supreme Court found that the Walthall County Circuit Court retained jurisdiction over Eddie Taylor, who had alleged that the agreement that formed the basis of his conspiracy charge occurred solely in Louisiana. The supreme court stated the following regarding the jurisdiction of Taylor's conspiracy charge:
Taylor claims that the lower court lacked jurisdiction over the conspiracy because the agreement allegedly took place in Louisiana, not in Walthall County, Mississippi. There was some conversation between Mr. Lampton, District Attorney, and Judge Starrett that the agreement took place on the way to Mississippi. Even if the agreement was made in Louisiana on the way to Mississippi, the conspiracy continued up until the commission of the crime in Walthall County. This Court in Norman v. State, 381 So.2d 1024, 1029 (Miss.1980), stated that
once a defendant is established as being a conspirator, he remains a part of the conspiracy until he has extricated himself therefrom by making full disclosure to the law enforcement authorities of his involvement and cessation of activity therein, or by communicating his abandonment thereof in a manner reasonably expected to reach his co-conspirators. The burden [of] establishing his withdrawal rests upon the defendant. Hyde v. U[nited] S[tates], 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); U[nited] S[tates] v. Borelli, 336 F.2d 376, 388 (2d Cir.1964).
Thus, the crime of conspiracy was committed in whole or in part in Walthall County, Mississippi. However, the record clearly shows by Taylor's own testimony that he and James Gatlin agreed on the porch of the murder victim's home in Walthall County to rob him.
Id.
¶ 15. In the present case, the alleged conspiracy, which began in Louisiana, was formed for the purpose of stealing the Jeep, which was subsequently stolen in Louisiana. Even under the logic from Taylor, wherein the court found that the conspiracy continued "until the commission of the crime," the conspiracy here would have only continued until the theft of the Jeep in Louisiana. Under these circumstances, we find that the circuit court lacked jurisdiction. Therefore, we reverse and render Count IV, wherein Elliott was convicted of conspiracy to possess stolen property.

3. Sufficiency of the Evidence
¶ 16. In his third contention of error, Elliott challenges the sufficiency of the evidence supporting his conviction and also contends that his conviction is against the overwhelming weight of the evidence. For *955 reasons that will be discussed more fully below, we find that there is sufficient evidence to support Elliott's remaining convictions.
¶ 17. We review the sufficiency of the evidence under a de novo standard of review. Tillis v. State, 43 So.3d 1127, 1133 (¶ 17) (Miss.2010). "[T]he critical inquiry is whether the evidence shows `beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed.'" Thomas v. State, 42 So.3d 528, 537 (¶ 31) (Miss. 2010) (quoting Jones v. State, 904 So.2d 149, 153 (¶ 12) (Miss.2005)). In considering the sufficiency of the evidence, we must "accept as true all evidence that is favorable to the State...." Id. (quoting Clemons v. State, 460 So.2d 835, 839 (Miss. 1984)).
¶ 18. In the interest of clarity, we will examine the factual basis for each of Elliott's convictions separately.

A. Count I: Armed Robbery
¶ 19. In Count I, Elliott was convicted of armed robbery. The indictment alleged that Elliott: "willfully, unlawfully, and feloniously ... attempt[ed] to take from the presence of Melissa Martin, automobile keys and/or other personal property of Jeffrey Hudson and Melissa Martin, against her will, by putting [her] in fear of immediate injury to her person...."
¶ 20. At trial, Melissa testified, in part, as follows during direct examination:
Q. What occurred when you got home [from work]?
A. Well, let's see ... we watched TV for a little while ... and then we kind of dozed off and went to sleep and I heard a knock at my door, and when I opened the door, it was Travis and he was, like, I have to use the bathroom, or let me in. I was, like, what are you doing out this late? And he was, like, just around and he was, like, I have to use the bathroom. So I opened the door, as being someone I knew, I opened the door and let him in and let him go to the restroom. And he had let another guy in which [sic] was [Wilson], I take it, because I had never seen him before. And so Travis went upstairs to use the restroom and then he came down. And then I like kinda heard something at my screen door and as I looked, it was a guy standing at my screen door and his face was covered and the bottom of his mouth was covered... he didn't say anything. So I went, Travis walked toward inside [sic] my kitchen, which was like right next to the living room, or whatever, so I walked back there and then he came back out and he opened the door and then the guy came in with the gun.
Q. Who opened the door?
A. Travis opened the door.
Q. And what did the guy do?
A. He held the gun up and said, "Sit down and be quiet," and I laughed for a minute and I'm, like, what's going on? And then Travis pulled out his little gun and I said I'm not playing; you know, Halloween just passed and it's too late to play dressup. And then he was like, no, we serious and I'm, like, what? And then he was, like, yeah, we serious. He said, "Calm down," and he was, like, where's the guy that drives the yellow car? And [I] said, well, he's not here. But he was there the whole time, but I'm, like, he's not here. He was like, well, he was talking a lot of noise earlier, where is he? I'm, like, what are *956 you talking about, `cause I know [Hudson] and [Hudson] never messes with anybody or bothers anybody and most of the time he comes to my house he's always inside. He never hangs outside, never mingles with other people. He's just there, you know, to sit and be with my sister. So I knew it couldn't a'been [sic] anything like that.
[PROSECUTOR SHOWS MELISSA A GUN]
Q. Do you know who had this?
A. That would be the other guy that came in with the bandana and stuff tied around his head, with the dreads.
Q. Do you see him in the courtroom today?
A. Yes, I do. (Pointing to defendant).
* * *
Q. When he came into your room, what did he say?
A. "Sit down and be quiet and don't move or I'll shoot you."
* * *
Q. And what was [Elliott] saying?
A. He was, like, sit down, don't move or we'll shoot you.
Q. At that moment....
A. I knew something was wrong, something, you know, wasn't right. And I kept asking him, you know, like, why do you want him? What did he do? And he never did say, but he was, like, where is he now? Where is he now? And I was, like, well, he's not here. He's at work, and he left the car with my sister, we have the car this weekend. And he was, like, I know he [sic] here and I said, "No, he's not."
Q. Why did you say he left the car here?
A. Because I guess they were thinking that he was there because the car was there and that he knew somebody had the keys to the car in there and he didn't think he would be the type to just leave his car, you know, in that location.
Q. So they were asking for the car or asking for the keys to the car?
[DEFENSE ATTORNEY]: Objection, leading.
A. Yeah, basically.
[THE COURT]: Sustained as to leading.
* * *
Q. Did they exit your apartment?
A. They only exited my apartment after, you know, like, he was, like, if he not in here and he won't come out, then I'll make him come out. So he ran straight towards [sic] the car, and my little sister then came downstairs and she was, like, what's going on? I guess she heard the confusion downstairs and so she came downstairs and she was, like, what is going on? And then she heard me tell him he wasn't here, like, "No, he's not here." That's, you know, we were outside then. And then she was, like, what are you doing? What are you doing? And he was, like, well, I know he's in there. I was like, no, he's not. And he was, like, well, I'm fixing to get this car, whatever, like that. And so I was, like, well, what's really going on? And then she went inside and I guess that's when she called the police or whatever like that and I was telling `em y'all better; just leave [sic]. Get away from us, just leave.
Q. And did they?

*957 A. No....
* * *
Q. Why did they leave?
A. It was after the guy, [Wilson] said, you know, somebody's done called the police. It's time to go. And, you know, I don't know for sure if they heard a siren or anything like that, but my sister came back outside and that's when she was, like, yeah, the police are on their way, you know, this and that, and that's when they left.
Q. Where was Travis at when she made that comment?
A. He was sitting in the car.
Q. He was trying to crank the car and playing with CDs.
¶ 21. Although Melissa's testimony indicates that Andry and the others were attempting to locate the owner of the yellow Mustang, nothing about the men attempting to locate Hudson precludes a conclusion that the men were attempting to steal property from Hudson. Given Elliott's statement prior to trial that he and the others went to the apartment with guns and that he knew Andry was going to pop the ignition in order to steal the Mustang, we find that sufficient evidence exists to prove that Elliott committed the offense of armed robbery.

B. Count II: Conspiracy to Commit Armed Robbery
¶ 22. In Count II of the indictment, Elliott was charged with conspiracy to commit armed robbery. Wilson testified that he, Andry, and Elliott decided to steal a vehicle from the apartment complex where Melissa lived. Wilson testified that he did not know Hudson, nor did he know whether Andry or Elliott knew Hudson. Wilson explained that they first went to the apartment complex and were "shooting dice" and that they looked around for a vehicle to steal; Wilson testified that the Mustang was not there at that time. Despite stating that the car was not at the apartment complex when they went there, Wilson then testified that they decided to steal the Mustang and take it to a chop shop. Wilson stated that their plan was to "go in there and get the keys and get the car and get the money...." When asked about what Andry and Elliott were demanding from the occupants of the apartment, Wilson stated that they were demanding "[t]he keys and the money." During cross-examination, it was revealed that Wilson had pleaded guilty to charges related to the alleged armed robbery; however, Wilson claimed that he did not know how much time he had gotten or what the sentencing recommendation was in his case.
¶ 23. "The general rule in Mississippi is that the uncorroborated testimony of an accomplice or a co-conspirator may be sufficient to sustain a conviction." Payton v. State, 897 So.2d 921, 936 (¶ 38) (Miss.2003) (citations omitted). However, an accomplice's testimony is not sufficient if it is "unreasonable, self-contradictory, or substantially impeached." Id. (citing Flanagan v. State, 605 So.2d 753, 758 (Miss.1992)).
¶ 24. Here, Wilson's testimony was corroborated by Elliott's pretrial statement to the police, wherein he said that Andry was going to pop the ignition on the Mustang in order to steal it. Although there were some inconsistencies within Wilson's statement, under the circumstances, we find that Wilson's testimony and Elliott's statement are sufficient to sustain Elliott's conviction for conspiracy to commit armed robbery.

C. Count III: Receipt of Stolen Property
¶ 25. Finally, Elliott argues that "[i]t was a legal impossibility for the jury *958 to convict [Elliott] of possession of stolen property [because the] testimony established that Travis, Walter, and Tony stole the 2004 Jeep Liberty in Louisiana." In support of his position, Elliott cites Young v. State, 908 So.2d 819, 830 (¶ 31) (Miss.Ct. App.2005) (citing Hentz v. State, 489 So.2d 1386, 1389 (Miss.1986)).
¶ 26. In its brief, the State argues that Elliott did not actually steal the Jeep. With all due respect, the record completely belies this contention. The only evidence regarding the Jeep's theft came from Wilson, who stated unequivocally that he, Andry, and Elliott had stolen the Jeep together. In fact, the prosecutor specifically asked Wilson who had stolen the Jeep, and Wilson responded: "Me, Travis, and Tony Elliot [sic]." Wilson elaborated that Andry sat in the driver's seat and physically "popped" the Jeep, but Wilson stated that they all picked the Jeep together and went to the location and stole it together.
¶ 27. Section 97-17-70 (Supp.2010) provides in pertinent part as follows:
(1) A person commits the crime of receiving stolen property if he intentionally possesses, receives, retains[,] or disposes of stolen property knowing that it has been stolen....
* * *
(3)(a) Evidence that the person charged under this section stole the property that is the subject of the charge of receiving stolen property is not a defense to a charge under this section; however, dual charges of both stealing and receiving the same property shall not be brought against a single defendant in a single jurisdiction.
Subsection (3)(a) of section 97-17-70 was added in 2007. It is clear from this subsection that a person who has stolen property may now be charged with either receiving or stealing the property, but not both. It is also clear that, notwithstanding the fact that the Jeep was stolen in Louisiana, Elliott could be prosecuted in Mississippi for receipt of stolen property because he possessed the stolen Jeep while in Mississippi. Accordingly, we find no merit to this issue.

4. Extraneous Bad Acts
¶ 28. In his fourth contention of error, Elliott contends that the circuit court erred in allowing the State to present evidence regarding the theft of the Jeep in Louisiana. Elliott contends that the Jeep's theft was an extraneous bad act, evidence of which should have been inadmissible.
¶ 29. At the outset, Elliott argues that it should have been obvious to the circuit court and the prosecutor that the circuit court had no jurisdiction over the theft of the Jeep. Elliott contends that, since the court had no jurisdiction, evidence of the Jeep's theft needed to comply with the standard rules for accepting evidence to be admissible at trial. It is obvious that Elliott's argument is premised on the erroneous notion that he could not be prosecuted in Mississippi for possessing and retaining possession in Mississippi of the Jeep that was stolen in Louisiana. The State was obligated to prove as an element of the crime of receipt of stolen property that the property was in fact stolen and that Elliott knew that it was stolen. Since the theft occurred in Louisiana, evidence concerning the theft that occurred there was relevant. Therefore, this issue lacks merit.

5. Prosecutorial Misconduct
¶ 30. Elliott contends that the prosecutor committed misconduct by indicting Elliott for receiving stolen property when Elliott had actually stolen the property in question. Elliott contends that "[a]ny testimony about stolen cars was *959 simply a way to introduce other bad acts to show that [Elliott] had stolen one car, so he must have been trying to steal another." We will reverse a criminal case for misconduct only when "prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice...." Goodin v. State, 787 So.2d 639, 645 (¶ 18) (Miss.2001) (citing Acevedo v. State, 467 So.2d 220, 226 (Miss.1985)).
¶ 31. Again, Elliott's argument here is premised on the erroneous notion that his indictment for receipt of stolen property is improper. As we have found that his prosecution for receipt in Mississippi of property that was stolen in Louisiana was proper, it necessarily follows that the prosecutor did not commit any misconduct. The fact that we are reversing and rendering Elliott's conviction for conspiring to receive stolen property does not prove that the prosecutor acted improperly in charging Elliott with receipt of stolen property. The two charges are separate and distinct. We also note that Elliott does not complain about the conspiracy charge in his discussion of this issue. There is no indication that the prosecutor acted in bad faith in indicting Elliott; therefore, we cannot find that the prosecutor's conduct endangered the fairness of Elliott's trial. This contention of error is without merit.

6. Cumulative Error
¶ 32. In his final contention of error, Elliott challenges his convictions on the ground of cumulative error. However, his brief provides no argument or authority regarding cumulative error and instead discusses plain error and the validity of Elliott's convictions for receiving stolen property and for conspiring to steal the Jeep. Although Elliott provides no argument regarding cumulative error, we find it sufficient to say that with respect to the three convictions that we are affirming, there is no error, and the fourth conviction is being reversed and rendered due solely to the circuit court's lack of jurisdiction over the charge. Therefore, this contention of error is also without merit.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF PIKE COUNTY OF CONVICTION OF COUNT I, ARMED ROBBERY; COUNT II, CONSPIRACY TO COMMIT THE CRIME OF ARMED ROBBERY; AND COUNT III, POSSESSION OF STOLEN PROPERTY, AND SENTENCE OF TWENTY-FIVE YEARS ON COUNT I AND FIVE YEARS ON EACH OF COUNTS II AND III, WITH THE SENTENCE IN COUNT II TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I AND THE SENTENCE IN COUNT III TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT II, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE DEFENDANT TO SERVE THE TWENTY-FIVE YEARS ON COUNT I AND THE SENTENCES ON COUNTS II AND III TO BE SUSPENDED, WITH FIVE YEARS OF POST-RELEASE SUPERVISION, IS AFFIRMED. THE JUDGMENT OF THE CIRCUIT COURT OF PIKE COUNTY OF CONVICTION OF COUNT IV, CONSPIRACY TO COMMIT THE CRIME OF POSSESSION OF STOLEN PROPERTY, IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
LEE, C.J., ISHEE AND ROBERTS, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN *960 OPINION. GRIFFIS, P.J., MYERS AND MAXWELL, JJ., NOT PARTICIPATING.
CARLTON, J., Concurring in Part and Dissenting in Part:
¶ 34. I respectfully concur in part and dissent in part with the majority's opinion. I would affirm the judgment of the trial court.
NOTES
[1] Although the judgment of the circuit court refers to the crime named in Mississippi Code Annotated 97-17-70 (Supp.2010), the statute under which Elliott was indicted, as possession of stolen property, the proper name is receiving stolen property. Unless the context requires otherwise, we will refer to the crime as "receipt" or "receiving" stolen property, except in the mandate where we track the wording in the judgment of the circuit court.
[2] The armed robbery occurred in Mississippi; the conspiracy to possess stolen property occurred in Louisiana, and the possession of the stolen property relates to a black Jeep, which was stolen in Louisiana by Elliott and the others and driven to Mississippi.